**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DICK'S SPORTING GOODS, INC., EDWARD W. STACK, LAUREN R. HOBART, and NAVDEEP GUPTA,<br><br>Defendants. | Case No.:<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR A JURY TRIAL</u> |

Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by DICK'S Sporting Goods, Inc. ("Dick's" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a Class (defined below) of all persons and entities that purchased Dick's common stock between September 8, 2025 and August

24, 2026, inclusive (the "Class Period"), against Dick's and certain of its officers and executives (collectively, "Defendants"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Dick's is the largest sporting goods retailer in the United States, offering sports equipment, footwear, and accessories, among other products.

3. On September 8, 2025, the first day of the Class Period, Dick's announced the completion of its acquisition of Foot Locker, Inc. ("Foot Locker"), a prominent footwear and apparel retailer, for approximately $2.5 billion in cash and stock.

4. The action alleges that Defendants misled investors regarding the Company's acquisition of Foot Locker, touting the acquisition as a strategic opportunity to drive growth and profitability while assuring investors that Foot Locker's longstanding inventory and promotional challenges had been resolved. In reality, those problems persisted, as Foot Locker remained heavily dependent on legacy footwear products that were exposed to intensifying promotional pressures across the athletic footwear industry. As a result, Dick's was never positioned to deliver the sales growth and profitability from the Foot Locker acquisition that it had touted to investors.

5. The truth was revealed to investors before markets opened on August 25, 2026, when Dick's reported disappointing second-quarter 2026 results, which included revenue of $1.73 billion from Foot Locker that fell well short of analysts' estimates of $1.81 billion. Dick's also reduced its net sales guidance for full-year 2026 and disclosed that it expected Foot Locker's proforma comparable sales to yield a range of negative 2.0% to 0.0% for the year—down from Dick's prior forecast of 1.5% to 3% growth.

6. In the related press release, Dick's Executive Chairman of the Board of Directors Edward W. Stack ("Chairman Stack") revealed that the athletic footwear marketplace had become "increasingly promotional," which significantly impacted the Foot Locker business because of its "greater exposure to legacy footwear" and "dependence on footwear launch and retro product." Analysts immediately reacted, with Baird calling the magnitude of the miss and guidance reduction a surprise given the Company's "bullish tone relatively recently."

7. On this news, the price of Dick's common stock fell $55.02 per share, or approximately 30%, to a closing price $124.31 per share on August 25, 2026.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Dick's is headquartered in this Judicial District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13. Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund provides pension benefits for eligible members and beneficiaries related to construction workers and others in Flagler, Volusia, and Brevard counties in Florida. Plaintiff manages approximately $90 million in assets for the benefit of approximately 600 members. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Dick's common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Dick's is incorporated under the laws of Delaware with its principal executive offices located in Coraopolis, Pennsylvania. Dick's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "DKS."

15. Defendant Edward W. Stack was the Executive Chairman of the Company's Board of Directors at all relevant times.

16. Defendant Lauren R. Hobart ("Hobart") was the Company's Chief Executive Officer ("CEO") and Director at all relevant times.

17. Defendant Navdeep Gupta ("Gupta") was the Company's Chief Financial Officer ("CFO") and Executive Vice President at all relevant times.

18. Defendants Chairman Stack, CEO Hobart, and CFO Gupta (collectively, the "Individual Defendants"), because of their positions with Dick's, possessed the power and authority to control the contents of, *inter alia*, Dick's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*,

the market. The Individual Defendants were provided with copies of Dick's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

19. Dick's and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20. Headquartered in Coraopolis, Pennsylvania, Dick's is the largest sporting goods retailer in the United States.

21. Before the Class Period, on May 15, 2025, Dick's announced that it had entered into an agreement to acquire Foot Locker for $2.5 billion in cash and stock.

22. At the time of the acquisition, market observers questioned the merits of the transaction. Foot Locker was then contending with declining mall traffic, excess and unproductive inventory, and industry-wide promotional pressure that weighed on margins and profitability.

23. Despite the market's concerns, in the press release announcing the acquisition, Chairman Stack represented to investors that Foot Locker presented a "meaningful opportunity for growth ahead," and that "[b]y applying our operational expertise to this iconic business, we see a clear path to further unlocking growth and enhancing Foot Locker's position in the industry."

**Defendants' Materially False and Misleading Statements**

24. The Class Period begins on September 8, 2025, when, before markets opened, Dick's issued a press release announcing that the acquisition of Foot Locker had been completed. In the press release, the Company touted that it was "now positioned to become a global leader in the sports retail industry at the intersection of sport and culture[.]" Additionally, in the press release, CEO Hobart proclaimed that "[b]ringing together the strengths of both companies will help us return Foot Locker to growth while continuing to fuel DICK'S momentum." CEO Hobart also highlighted that "[a]s a combined company, DICK'S and Foot Locker will create a global platform that will redefine the sports retail industry and unlock value for both companies, our brand partners, our teammates, our communities and our shareholders."

25. On November 25, 2025, during the Company's earnings call for the third quarter of 2025, Chairman Stack assured investors that the Company would resolve Foot Locker's prior operational struggles related to underperforming inventory and stores, stating that after "looking even deeper under the hood as the owners of Foot Locker, our conviction that we can turn this business around has only grown." Indeed, Chairman Stack explained that Dick's "first priority" was to "clean out the garage of underperforming assets," including "clearing out unproductive inventory" and "closing underperforming stores and rightsizing assets that don't align with our go-forward vision for the Foot Locker business." Chairman Stack further stated, in relevant part:

> We have identified an initial number of underperforming assets around the globe, including inventory that needs to be marked down and liquidated along with a preliminary number of stores that need to be impaired or closed. ***We initiated certain pricing actions in late Q3 and will be more aggressive in Q4 to clean up unproductive inventory. Our intent is to get the vast majority of the inventory charges behind us by the end of the year***, so we can start 2026 fresh and position Foot Locker for an inflection point during the back-to-school season in 2026.

26. On March 12, 2026, Dick's issued a press release to announce its financial results for the fourth quarter and full year of 2025. In the press release, Chairman Stack touted that Dick's efforts to "clean out of the garage" had set Foot Locker up to "play offense and deliver the inflection point we expect beginning with back-to-school[,]" and that the Company remained "very confident that DICK'S and Foot Locker are stronger together[.]"

27. That same day, during the corresponding earnings call, Chairman Stack touted Dick's significant progress in the turnaround efforts concerning Foot Locker, as the Company had "essentially complete[d]" the cleanup of Foot Locker's unproductive inventory. Specifically, Chairman Stack, in relevant part, stated:

> Now looking ahead, we're excited to rapidly scale Fast Break by back-to-school 2026. As discussed last quarter, our first priority was to clean out the garage, starting with addressing unproductive inventory. ***The team moved quickly and decisively to get this done, and we're pleased to report that the inventory cleanup is now essentially complete***. That work drove the fourth quarter profitability results we told you to expect. And as part of this process, we also leveraged DICK'S value chain to efficiently clear product. We're also pleased that Q4 sales came in better than expected.

28. In further discussing the Company's progress with respect to revamping Foot Locker's business and operations, Chairman Stack stated that "we believe that Foot Locker's inventory is now well positioned with this heavy lift behind us," while touting that Dick's was "set up to play offense and deliver the inflection point we expect to see in this business starting with back-to-school."

29. On that same call, in response to a Barclays analyst's inquiry about the current state of Foot Locker's inventory and whether there was "more work to do[,]" Chairman Stack explained:

> I can tell you that the team did across the globe, a great job to clean out the garage. There was a lot of excess inventory there, inventory

> that wasn't very productive. Like we said in the Fast Break stores, we took out roughly 30% of the SKUs and kind of fixed that run-on sentence that was the Foot Locker shoe wall. The team across the globe, North America, Europe, Asia really got behind this whole clean out the garage objective and did that. ***And to be honest with you, we're—that work is done. That's behind us. We cleaned out the garage with markdowns in the stores and move product through the Foot Locker stores and the Champs stores***. We also utilized—and I think this is one of the benefits of the acquisition between DICK'S and Foot Locker.
>
> We actually utilized the DICK'S value chain of Going, Going, Gone to clean out a lot of that inventory. We were able to recover a higher cash amount by putting it through the DICK'S value chain than if we sent that out through a jobber. And it's—we're really well positioned. ***This inventory at Foot Locker is probably cleaner than it has ever been. And that's going to—that should bode well for our margins and our sales going forward, returning this chain to growth with a comp of 1% to 3% should have margin expansion here.*** We're confident of that. ***So all in all, to clean out the garage, the team did a great job, and we're done.***

30. Additionally, a Morgan Stanley analyst asked about margin expansion concerning Dick's and Foot Locker. In response, CFO Gupta stated that, despite the fourth quarter environment being "very promotional, we were very happy with the 67 basis points of margin expansion we posted here in Q4." He further added that "our merchants and the inventory management team did a phenomenal job to finish the year strong from a clean inventory and driving top line momentum as well as gross margin expansion."

31. In response to that same analyst's question, Chairman Stack echoed CFO Gupta's remarks, stating, "I think the team did a fabulous job managing our margin rates and the profitability of the business and the operating margins in an environment that was as promotional as it was."

32. On April 8, 2026, Dick's presented at the 2026 J.P. Morgan Retail Round Up Forum. A J.P. Morgan analyst asked whether, "now that the garage is cleaned out" and with

"promotionality [] going to be a lot lower," investors should expect margins at Foot Locker to "rebound." Chairman Stack responded by stating:

> So[,] we're not going to provide that guidance for you. But we do have kind of indicated that we expect that margin rate to get better. And as of right now, that's kind of what we're going to—we're not going to—we're going to make sure we don't get out over our skis. ***But you will see margin rate expansion, which is part of what's taken us to grow this business again and to return it to profitability. But like I said, as we get a little bit further along and we can prove it, we'll give you more visibility to it.***

33. Then, on May 27, 2026, Dick's held its first-quarter 2026 earnings call. During the question-and-answer portion of the call, a Truist analyst asked about the "promotional environment" and how it "impacts" both Dick's and Foot Locker. CEO Hobart responded by stating that in the first quarter promotional activity "wasn't a major factor[]," and that, with respect to both Dick's and Foot Locker, "we'll manage through any promotional environment." She further added that "[w]e've got advanced pricing capabilities where we can really be curated in how we lean into a promotional environment, but nothing on the horizon that we're particularly concerned about."

34. The above statements identified in ¶¶ 24-33 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Dick's cleanup efforts concerning Foot Locker's inventory were not complete, and, in fact, Foot Locker remained saddled with unproductive and stagnant legacy footwear; (2) Foot Locker heavily relied on legacy footwear products that were particularly vulnerable to intensifying promotional pressures across the athletic footwear industry; (3) in turn, Dick's was significantly exposed to an industry-wide environment of excess inventory and resulting promotional activity; (4) accordingly, Dick's was unable to

achieve the sales growth, margins, and profits it touted to investors; and (5) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Revealed**

35. The truth was revealed before markets opened on August 25, 2026, when Dick's issued a press release announcing its financial results for the second quarter of 2026. Specifically, the Company reported adjusted earnings per share of $3.53 per share, which fell short of analysts' estimates of $3.76 per share. Notably, Dick's also disclosed that Foot Locker generated revenue of only $1.73 billion, significantly below analysts' expectations of $1.81 billion. The Company also reduced its full-year 2026 consolidated net sales guidance to a range between $21.9 billion to $22.2 billion (down from $22.1 billion to $22.4 billion). Dick's further revealed that it expected Foot Locker's proforma comparable sales to yield a range of negative 2.0% to 0.0% for the year—a sharp deterioration from Dick's prior forecast of 1.5% to 3% growth for Foot Locker.

36. In the press release, Chairman Stack conceded that "[a]s the quarter progressed, conditions across portions of the athletic footwear and apparel marketplace became increasingly promotional, and we took action to remain competitively priced." Chairman Stack further explained that this environment had a more "significant impact" on Foot Locker due to its "greater exposure to legacy footwear silhouettes and greater dependence on footwear launch and retro product." Chairman Stack also noted that "[n]ot only were there fewer launches in the second quarter, but those launches performed below both industry and our expectations."

37. During the related earnings call, Chairman Stack traced the promotional activity to "inventory levels [] building up across parts of the industry," which negatively impacted Foot Locker's business, stating:

> ***[A]s the quarter progressed, it became clear that inventory levels were building up across parts of the industry, leading to a much more promotional environment*. *This pressured our overall company earnings.*** Consumer preferences are evolving with athletes increasingly responding to newness, innovation and a broader set of brands. ***As demand continued to shift during the quarter, inventory built up in parts of the industry, particularly within certain legacy footwear silhouettes and apparel franchises that simply aren't resonating the way they once did.***
>
> As you would expect, given its greater exposure to many of the legacy footwear silhouettes, ***the impact was more significant at Foot Locker. In addition, Foot Locker is more dependent on launch and retro product. Not only were there fewer launches in the second quarter, but the launches we did see performed below industry and our expectations. This had a meaningful impact on the results across the Foot Locker business*. *We're taking action to shift the mix toward in-demand brands.*** And while we expect the launch calendar to be more favorable in the back half of the year, the quality of those launches will be critical. We expect the broader promotional environment, particularly around legacy silhouettes to remain challenging at least through the fourth quarter.

38. During the call, pressed by a Morgan Stanley analyst on what had suddenly changed—given that just "90 days ago" Dick's was "raising guidance and speaking very optimistically about both Dick's and Foot Locker"—Chairman Stack explained that market participants had become "more promotional to clear inventory," and that the excess inventory "really contributed" to Foot Locker's very "real margin pressure."

39. On this news, the price of Dick's common stock fell $55.02 per share, or approximately 30%, to close at a price of $124.31 per share on August 25, 2026.

40. Analysts were stunned by the revelations. For example, Baird analysts substantially lowered their price target for Dick's stock and issued a report, noting the Company's disclosures had lowered their "conviction materially" and describing the guidance reduction as a surprise given "management's bullish tone relatively recently." The Baird analysts added that the "miss and guide-down magnitude surprised us," leaving investors to debate the outcome of Foot Locker's

"reset timeline" and management "credibility." Similarly, Barclays analysts also lowered their estimates and price target, while explaining that investors' reaction to Dick's second-quarter results reflected a "significant reset of investor expectations for the athletic footwear ecosystem."

## CLASS ACTION ALLEGATIONS

41. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons and entities that purchased Dick's common stock between September 8, 2025 and August 24, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, Dick's common stock actively traded on the NYSE (an open and efficient market) under the symbol "DKS." Millions of Dick's shares were traded publicly during the Class Period on the NYSE. As of August 28, 2026, the Company had more than 65 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Dick's or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

43. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

45. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Dick's;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Dick's;

e) whether the market price of Dick's common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

46. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

47. The market for Dick's common stock was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Dick's common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Dick's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Dick's and have been damaged thereby.

48. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Dick's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were

a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

49. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

50. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Dick's, their control over, receipt, and/or modification of Dick's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Dick's, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

52. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Dick's who knew that the statement was false when made.

## LOSS CAUSATION

53. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

54. As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Dick's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Dick's common stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

55. The market for Dick's common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Dick's common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Dick's common stock and market information relating to Dick's and have been damaged thereby.

56. At all times relevant, the market for Dick's common stock was an efficient market for the following reasons, among others:

a) Dick's was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Dick's filed periodic public reports with the SEC and/or the NYSE;

c) Dick's regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) Dick's was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

57. As a result of the foregoing, the market for Dick's common stock promptly digested current information regarding Dick's from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Dick's common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

58. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

59. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dick's common stock; and (iii) cause Plaintiff and other members of the Class to purchase Dick's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

61. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Dick's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Dick's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dick's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Dick's and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

63. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management

team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

64. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Dick's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Dick's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Dick's common stock during the Class Period at artificially inflated prices and were damaged thereby.

66. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Dick's was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Dick's common stock, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

67. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against All Individual Defendants

69. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70. The Individual Defendants acted as controlling persons of Dick's within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and

misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

73. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other and further relief as this Court deems appropriate.

**JURY DEMAND**

74. Plaintiff demands a trial by jury.

Dated: September 4, 2026

Respectfully submitted,

By: */s/ Vincent A. Coppola*

**PRIBANIC & PRIBANIC, LLC**
Vincent A. Coppola
Penn. Attorney #50181
513 Court Place
Pittsburgh, PA 15219
Tel.: (412) 281-8844
Fax: (412) 281-4740
Email: vcoppola@pribanic.com

*Liaison Counsel for Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
Nicholas Corso (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
ncorso@saxenawhite.com

Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com

*Counsel for Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund*